**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **BRENDA VITALIS**<br>    Plaintiff<br><br>v.<br><br>**CPORT CREDIT UNION**<br>    Defendant | CIVIL ACTION NO: |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Brenda Vitalis brings the following complaint against CPort Credit Union:

**Introduction**

1) Brenda Vitalis was the victim of a sophisticated and increasingly common scam in which fraudsters exploit unsuspecting individuals by transferring money between their accounts and tricking them into believing they've received an erroneous deposit that they must return.

2) In Brenda's case, she lost $58,000.

3) The loss was only after a series of very suspicious and out-of-character transactions:

   a) First, someone controlling Ms. Vitalis' computer, unbeknownst to her, opened online banking on April 30, 2024. Before that day, Brenda used pen and paper checkbook registers and careful, conservative banking.

   b) Then, an unauthorized transfer of $30,000 from Ms. Vitalis' Line of Credit to her savings account.

   c) Then, an unauthorized transfer of $30,000 from the savings account to the checking account.

d) Then, hours later, Ms. Vitalis arrives at the bank, and for the first time in her life, makes a large cash withdrawal.

e) Then, another the next day.

f) Then, a few days later, another $28,000 is transferred (unauthorized) from the line of credit to savings, to checking and then withdrawn in cash.

4) Ms. Vitalis brings suit because the Defendant allowed the unauthorized transfers (HELOC to Savings and Savings to Checking) that this common scam is built upon to happen, and then failed to fix its errors.

5) The scam that targeted Brenda Vitalis is part of a well-documented and increasingly prevalent form of financial fraud. These scams often involve fraudsters impersonating legitimate entities—such as banks, tech support, or payment services—who trick unsuspecting victims into believing they've received a mistaken deposit or that there is an issue requiring immediate action. Once they gain the victim's trust, the scammers manipulate account holders into transferring funds, leaving victims to suffer significant financial harm.

6) Banks are aware of these scams, or should be.  Reports of such fraudulent schemes have increased in recent years. Regulatory bodies, including the Federal Trade Commission (FTC) and the Consumer Financial Protection Bureau (CFPB), have issued warnings about scams involving unauthorized electronic fund transfers, mistaken deposit schemes, and fraudulent account manipulation. Financial institutions are expected to implement safeguards and detection mechanisms designed to protect account holders from precisely this type of fraud.

7) In these types of scams, the fraudsters' tactics often include exploiting online banking access, creating fake emergencies, and pressuring victims to act quickly before they can verify the legitimacy of the request. Despite these known patterns, many banks, including Defendant, fail to detect and prevent such fraudulent activity. Transfers of unusually large amounts or between

unfamiliar accounts are often red flags that sophisticated financial institutions should monitor, investigate, and act upon.

8) Defendant, as a financial institution entrusted with safeguarding Plaintiff's accounts, had a duty to use reasonable fraud detection measures and to protect against unauthorized electronic fund transfers. The failure to intervene when clear signs of fraudulent activity were present—such as large, rapid transfers and withdrawals—demonstrates a failure to act in accordance with industry standards and regulatory expectations.

9) Defendant's inaction enabled the fraud to proceed unchecked, leaving Plaintiff to bear the loss.

10) Plaintiff, Brenda Vitalis ("Plaintiff"), by and through her undersigned counsel, brings this Complaint against CPort Credit Union ("Defendant") for violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., the Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666 et seq., 15 U.S.C. § 1681 et seq., the Fair Credit Reporting Act ("FCRA") and for unjust enrichment.

11) Plaintiff makes these allegations upon personal knowledge as to her own actions and upon information and belief as to the actions of others.

12) The violations detailed below were committed by Defendant knowingly, intentionally, and without regard for Plaintiff's rights and safety, causing substantial financial harm and emotional distress.

## I.    Jurisdiction and Venue

13) This Court has jurisdiction under 15 U.S.C. § 1693m (EFTA) and 15 U.S.C. § 1640(e) (FCBA), 15 U.S.C. § 1681n and § 1681o ("FCRA"), which provide for a private right of action for violations of these statutes.

14) This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

15) Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in Maine, and the events giving rise to this action occurred in Maine.

## II.    Parties

16) Plaintiff Brenda Vitalis is a resident of Jefferson, Lincoln County, Maine, and is a "consumer" as defined by 15 U.S.C. § 1693a(6) and 15 U.S.C. § 1602(h).

17) Plaintiff is a "consumer" as that term is defined by 15 U.S.C § 1681a(c).

18) Plaintiff is an "obligor" as that term is used in 15 U.S.C. § 1666.

19) Defendant is a furnisher under the FCRA, 12 CFR § 1022.41(c).

20) Defendant CPort Credit Union is a Maine-based credit union with its principal place of business in Portland, Maine. Defendant is a "financial institution" as defined by 15 U.S.C. § 1693a(9) and a "creditor" as defined by 15 U.S.C. § 1602(g).

21) Plaintiff is a "consumer" as defined by 15 U.S.C. § 1681a(b).

## III.    Factual Allegations

22) Plaintiff has maintained several accounts with Defendant, including a checking account, a savings account, and a Home Equity Line of Credit ("HELOC").

23) The checking account and savings account maintained by Plaintiff are "accounts" as defined by 15 U.S.C. § 1693a(2), which are established primarily for personal, family, or household purposes and are subject to the protections provided under EFTA. These accounts were used solely for Plaintiff's personal and family financial management, including paying bills, managing household expenses, and maintaining savings.

24) The HELOC maintained by Plaintiff is an "open-end credit plan" as defined by 15 U.S.C. § 1602(i), which qualifies for protections under FCBA when billing errors occur. Plaintiff used the HELOC exclusively for household-related expenses, including home repairs and maintenance.

25) Plaintiff began banking with Defendant in 2010 and consistently maintained conservative financial practices.

## IV.        The Fraud

26) On or about April 30, 2024, Plaintiff received a phone call from an individual claiming to be a representative from PayPal ("the fraudster").

27) The fraudster informed Plaintiff that she had supposedly made a $599 payment to GoFundMe, which Plaintiff had not authorized. The fraudster said they would refund the money by making two $300 payments to Plaintiff's account.

28) To assist her with "refunding" the money, the fraudster deceived Plaintiff into following their instructions.

29) During the call, the fraudster instructed the Plaintiff to install software on her computer. Unbeknownst to the Plaintiff, this allowed the fraudster to gain remote access to the Plaintiff's computer and set up online banking access. The plaintiff, under the impression that she was helping to get a refund she was supposed to get, did what the fraudster asked.

30) Plaintiff did not know what the fraudster was doing.

31) Prior to April 30, 2024, the Plaintiff did not have access to her accounts through online banking and had never set up or used online banking before.

32) Plaintiff did not know, until she spoke with Defendant some days later, that she even had online access to her bank accounts.

33) Specifically, the fraudster executed the following unauthorized transactions in violation of 15 U.S.C. § 1693f(f)(2), which covers unauthorized electronic fund transfers "from or to" a consumer's account:

a) On April 30, 2024, a $30,000 transfer from Plaintiff's HELOC *to her savings account*, which was an incorrect electronic fund transfer to Plaintiff's account under 15 U.S.C. § 1693f(f)(2) and/or an unauthorized electronic funds transfer under 15 U.S.C. § 1693f(f)(1).

b) On April 30, 2024, a subsequent $30,000 transfer from Plaintiff's savings account to her checking account which was an incorrect electronic fund transfer to Plaintiff's account under 15 U.S.C. § 1693f(f)(2) and/or an unauthorized electronic funds transfer under 15 U.S.C. § 1693f(f)(1).

c) On May 2, 2024, a $28,000 transfer from Plaintiff's HELOC *to her savings account*, which was an incorrect electronic fund transfer to Plaintiff's account under 15 U.S.C. § 1693f(f)(2) and/or an unauthorized electronic funds transfer under 15 U.S.C. § 1693f(f)(1).

d) On May 2, 2024, a subsequent $28,000 transfer from Plaintiff's savings account to her checking account which was an incorrect electronic fund transfer to Plaintiff's account under 15 U.S.C. § 1693f(f)(2) and/or an unauthorized electronic funds transfer under 15 U.S.C. § 1693f(f)(1).

34) The transfers referenced above, in Paragraph 33, constitute unauthorized electronic fund transfers under 15 U.S.C. § 1693a(12) because they were initiated by a person other than Plaintiff without actual authority.

35) The transfer from the HELOC without authorization was also a "billing error" per 15 U.S.C. § 1666(b)(1) because it represented an extension of credit not made by Plaintiff or anyone authorized by Plaintiff.

36) The Plaintiff received no benefit from the transfer from the HELOC to her savings account; she was harmed by it. This transfer made it possible for the fraudster to perpetrate the fraud and later transfer the funds to her checking account to further the fraud.

37) The Plaintiff received no benefit from the transfer from her savings account to her checking account; she was harmed by it. But for the transfer of $30,000 to her checking account, she would not have believed the fraudster's lie that they had accidentally deposited $30,000 into her bank account, and she would not have had the funds available to withdraw the money she withdrew and deposited the money into the atm at the fraudster's direction.

38) Later that day, the fraudster contacted Plaintiff again, claiming that there had been an overpayment error. They said that instead of sending one of the anticipated $300 payments, they had accidentally sent $30,000 and they pressured her to withdraw $20,000 in cash and deposit it into an ATM designated by the fraudster. Based on the fraudster's lies, the Plaintiff believed that if she did not "return" the money, both she and the fraudster (who she thought was someone who had been trying to help her and who she wanted to help) would get in trouble and that her computer would be shut down.

39) Fearing the consequences as described by the fraudster, Plaintiff complied and withdrew the cash, depositing it into the ATM as instructed.

40) On May 1, 2024, Plaintiff was again contacted by the fraudster and directed to withdraw an additional $9,000, which she also deposited into the ATM.

41) On May 2, 2024, the fraudster claimed another error had occurred and pressured Plaintiff to withdraw $28,000, which Plaintiff, still believing the fraudster's claims, deposited into the ATM.

42) Plaintiff did not authorize the transfer of funds from her HELOC to her savings account, nor did she authorize the subsequent transfer of funds to her checking account, and she did not benefit from the transfers in any way.

43) Plaintiff did not benefit from any of the unauthorized transactions. The funds withdrawn were handed over to the fraudster under false pretenses, and Plaintiff suffered a total financial loss of $58,000.

44) The plaintiff acted in good faith, relying on the false representations made by the fraudster. She feared penalties, loss of computer access, and financial harm as a result of the fraudster's coercive tactics.

45) At all relevant times, Plaintiff's online banking credentials were obtained and used fraudulently by the fraudster without her consent.

46) Defendant had a duty to identify and respond to unusual or suspicious account activity, particularly given the size and frequency of the transactions.

47) Defendant's failure to implement reasonable fraud detection measures allowed the fraudster to successfully execute unauthorized transfers and withdrawals, directly resulting in Plaintiff's financial losses.

48) On May 8, 2024, Plaintiff visited Defendant's branch and reported the suspicious transactions, seeking clarification regarding her accounts.

49) Defendant informed Plaintiff that the funds in question were transferred from her HELOC and that the transactions appeared on her account statements.

50) Plaintiff, realizing that she had been defrauded, immediately requested assistance from Defendant to rectify the situation.

51) On or around May 8, 2024, without the Plaintiff's permission or authorization, Defendant transferred funds from Plaintiff's accounts to pay down the balance of the HELOC, depleting the Plaintiff's savings.

52) Plaintiff also reported the fraudulent activity to local law enforcement and provided all relevant details regarding the unauthorized transactions.

53) The plaintiff received her periodic account statements reflecting the unauthorized transactions initiated by the fraudster in May of 2024.

54) On June 6, 2024, Plaintiff sent a written notice to Defendant, outlining the unauthorized nature of the transactions and requesting an investigation in accordance with EFTA and FCBA requirements. A copy of that communication is attached as Exhibit A.

55) The notice detailed the timeline of events, the fraudulent transactions, and Plaintiff's lack of knowledge or consent regarding the transfers.

56) Plaintiff's written notice complied with the requirements set forth in 15 U.S.C. § 1693f(a) (EFTA) and 15 U.S.C. § 1666(a) (FCBA), which require consumers to report unauthorized transactions or billing errors in writing within 60 days of receipt of the first statement reflecting the error.

57) Plaintiff's accounts, including her HELOC, are governed by statutory protections under EFTA and FCBA, making Defendant responsible for addressing and correcting errors related to unauthorized transactions.

58) On June 27, 2024, Defendant responded by denying liability and asserting that the transactions were authorized because they were initiated through Plaintiff's online banking portal. A copy of the Defendant's response is attached as Exhibit B.

59) Defendant claimed that because the transfers were between Plaintiff's own accounts, they did not constitute unauthorized transactions under EFTA.

60) Defendant further stated that its actions complied with all regulatory obligations and that it bore no responsibility for Plaintiff's losses.

61) Despite Plaintiff's clear and timely notice of the fraudulent activity, Defendant failed to:

   a)  Conduct a thorough and good-faith investigation into the reported billing errors and unauthorized transfers.

b) Provisionally recredit Plaintiff's account during the pendency of the investigation.

c) Offer any meaningful assistance or remedy to mitigate Plaintiff's financial harm.

d) Return the funds to her account.

62) Defendant's refusal to acknowledge the unauthorized nature of the transactions and its failure to follow the procedural safeguards outlined in EFTA and FCBA caused Plaintiff significant financial loss and emotional distress.

63) Plaintiff, already facing significant personal hardships, including caring for her dying husband, sick daughter, and her grandchild, experienced additional emotional distress due to Defendant's inadequate response.

64) Plaintiff has also had to put her life plans on hold. She had planned, after her husband passed away, to remodel her garage with her savings so that she could live in the garage and her daughter and grandchild could live in the house. She had not been able to do this because of the loss.

65) The loss of $58,000 in unauthorized withdrawals left Plaintiff financially devastated, with no immediate means to recover her losses.

66) Plaintiff's trust in Defendant's ability to safeguard her accounts was irreparably harmed.

67) Plaintiff has suffered the following emotional harms, physical symptoms, and manifestations as a result of the emotional distress caused by the Defendant's failure to comply with the law:

a) Loss of sleep

b) Inability to focus

c) Paranoia and stress when the phone rings

d) Fear

e) Insecurity

f) Worry

g) Nausea, vomiting, ulcers, and inflammation in the bowels

h) Diarrhea

i) Loss of enjoyment of life

j) Anxiety

k) Shame

l) Loss of trust in Banks

m) Loss of faith in herself

## Count I: Violation of the Electronic Fund Transfer Act (EFTA)

68) Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

69) Defendant violated EFTA by:

a)  Failing to investigate and resolve the unauthorized electronic fund transfers initiated by the fraudster.

b) Failing to provisionally recredit Plaintiff's account within ten business days of receiving notice of the unauthorized transfers.

c) Misclassifying the fraudulent transactions as authorized transfers despite clear evidence of unauthorized access and control by the fraudster.

d) Refusing to credit  the Plaintiff the funds that were transferred without her permission.

70) Defendant's failure to follow the statutory requirements under 15 U.S.C. § 1693f directly contributed to Plaintiff's financial losses.

71) As a direct and proximate result of Defendant's violations, Plaintiff suffered financial loss, emotional distress, and other damages, including attorney's fees and costs.

72) A consumer harmed by a financial institution is entitled to treble damages if "the financial institution did not provisionally recredit a consumer's account within the ten-day period

specified in subsection (c), and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error." 15 U.S.C. § 1693f(e)(1).

73) Defendant did not provisionally recredit Plaintiff's account within the ten-day period specified and, on information and belief, Defendant did not make a good faith investigation of the alleged error and/or did not have a reasonable basis for believing that the consumer's account was not in error.

74) In addition, a consumer harmed by a financial institution shall be entitled to treble damages "if a financial institution knowingly and willfully conclude[s] that [a] consumer's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation[.]" 15 U.S.C. § 1693f(e)(2).

75) Defendant, on information and belief, knowingly and willfully concluded that Plaintiff's consumer's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to Defendant at the time of its investigation.

## Count II: Violation of the Fair Credit Reporting Act (FCRA)

76) Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

77) Defendant, CPort Credit Union, is a "furnisher" of information to consumer reporting agencies as defined by 15 U.S.C. § 1681s-2.

78) As a furnisher of information, Defendant has a duty under 15 U.S.C. § 1681s-2(a) to provide accurate information to consumer reporting agencies regarding Plaintiff's accounts and a duty to appropriately report disputed accounts as disputed.

79) As evidenced by Plaintiff's letter to Defendant dated June 6, 2024, Plaintiff explicitly disputed the accuracy of information related to the unauthorized transactions on her accounts that Defendant was reporting to consumer reporting agencies.

80) Additionally, Plaintiff sent a second letter to Defendant on March 18, 2025, in which she explicitly stated: "Please stop reporting this. It looks like I asked for this, and I am irresponsible. But I'm not. Please report what actually happened... Please remove this from my credit report." A copy of Ms. Vitalis' March 18, 2025, dispute is attached as Exhibit C.

81) In letters to Equifax and TransUnion dated December 12, 2024, Plaintiff disputed the accuracy of the HELOC account information being reported by Defendant.

82) Upon information and belief, following Plaintiff's disputes to the credit reporting agencies, those agencies notified Defendant of the dispute as required by 15 U.S.C. § 1681i(a)(2).

83) Defendant violated 15 U.S.C. § 1681s-2(a) by:

   a) furnishing information to consumer reporting agencies that it knew was inaccurate or consciously avoided knowing was inaccurate;

   b) furnishing information to consumer reporting agencies without notice that such information was disputed by Plaintiff, despite receiving multiple written disputes from Plaintiff;

   c) furnishing inaccurate information to consumer reporting agencies after having been informed by the Plaintiff that the information was inaccurate.

84) Defendant violated 15 U.S.C. § 1681s-2(b) by:

   a) Failing to conduct a reasonable investigation of Plaintiff's dispute;

   b) Failing to review all the information provided by the consumer reporting agency regarding the dispute;

   c) Failing to modify, delete, or block the reporting of information that was inaccurate or could not be verified; and

d) Continuing to report the fraudulent transactions as legitimate obligations of Plaintiff.

85) The information C-Port furnished was inaccurate because, among other things:

a) The account balance reported ($58,800 in May 2024) included charges that were the result of unauthorized transactions initiated by fraudsters, not legitimate debt incurred by Plaintiff;

b) The account was reported with a status of "Current: Paid or Paying as Agreed" rather than as a disputed account despite Plaintiff's multiple written disputes to C-Port;

c) The account was reported as a legitimate debt obligation of Plaintiff when in fact the transactions were the result of criminal activity that Defendant itself acknowledged was a "fraud scheme"; and

d) The credit reporting failed to indicate that the increased balances resulted from unauthorized access to Plaintiff's online banking, which Defendant admitted occurred when it stated that "fraudsters" had gained "remote access to [Plaintiff's] computer."

86) The defendant had actual knowledge that the information it was furnishing to the consumer reporting agencies was inaccurate, as evidenced by:

a) Plaintiff's explicit written disputes to Defendant in June 2024 and March 2025;

b) The police report filed by Plaintiff in May 2024 documenting the fraud, which was made available to Defendant;

c) The suspicious nature of the transactions themselves, which showed a clear pattern consistent with known fraud schemes; and

d) Defendant's acknowledgment in its June 27, 2024 response that Plaintiff was "one of the many people who fall victim to fraudsters every day."

87) Defendant's violations were willful, as demonstrated by:

a) Defendant's statement in its June 27, 2024 response that it "bears no liability for this situation" despite clear evidence of fraud;

b) Defendant's insistence that the transactions were authorized despite acknowledging they were initiated by fraudsters who had gained remote access to Plaintiff's computer; and

c) Defendant's failure to mark the account as disputed in credit reporting even after receiving multiple disputes from Plaintiff.

88) Alternatively, Defendant's violations were negligent, as Defendant failed to follow reasonable procedures to ensure the accuracy of the information it reported about Plaintiff to consumer reporting agencies.

89) As a direct and proximate result of Defendant's violations of the FCRA, Plaintiff has suffered actual damages, including but not limited to:

a) Damage to her credit reputation and credit score;

b) Increased difficulty obtaining credit, evidenced by being required to take a higher interest rate on the fraudulently obtained HELOC balance;

c) Emotional distress, including anxiety, stress, humiliation, and loss of sleep;

d) Physical manifestations of emotional distress as detailed in paragraph 67; and

e) Out-of-pocket expenses associated with disputing the inaccurate information.

90) Pursuant to 15 U.S.C. § 1681n, Plaintiff is entitled to actual damages, statutory damages, punitive damages, costs, and attorney's fees for Defendant's willful violations of the FCRA.

91) Alternatively, pursuant to 15 U.S.C. § 1681o, Plaintiff is entitled to actual damages, costs, and attorney's fees for Defendant's negligent violations of the FCRA.

### Count III: Violation of the Fair Credit Billing Act (FCBA)

92) Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

93) Defendant violated FCBA by:

a) Failing to correct billing errors related to unauthorized charges on Plaintiff's HELOC.

b) Failing to conduct a good faith investigation into Plaintiff's billing error dispute.

c) Continuing to hold Plaintiff liable for fraudulent charges despite receiving timely and detailed notice of the dispute.

94) The unauthorized charges against Plaintiff's HELOC qualify as a "billing error" under 15 U.S.C. § 1666(b)(1) because they represent an extension of credit not made by Plaintiff or anyone authorized by Plaintiff.

95) As a direct and proximate result of Defendant's violations, Plaintiff incurred financial losses, emotional distress, and other damages.

## Count IV: Unjust Enrichment

96) Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

97) Defendant unjustly retained a benefit at Plaintiff's expense by collecting interest on the fraudulent HELOC advance and treating Plaintiff as liable for repayment of the unauthorized transactions.

98) Despite being on notice of the fraud and Plaintiff's lack of authorization, Defendant continued to demand repayment of the HELOC advance and retained interest payments made by Plaintiff.

99) It would be inequitable and unjust for Defendant to retain these benefits, as they were obtained through unauthorized and fraudulent transactions, for which Plaintiff bore no responsibility.

100) Equity and good conscience require Defendant to return any amounts paid by Plaintiff toward the fraudulent HELOC advance and to waive further obligations arising from the unauthorized transactions.

**Prayers for Relief**

The Plaintiff asks that the Court find the Defendant liable for its violations of the EFTA, FCBA, FCRA, and for Unjust Enrichment and Order:

a) Disgorgement of any amounts unjustly retained by Defendant, including interest payments made by Plaintiff toward the unauthorized HELOC transactions.

b) Actual damages in an amount to be determined at trial;

c) Statutory damages pursuant to 15 U.S.C. § 1693m and 15 U.S.C. § 1640;

d) Treble damages pursuant to 15 U.S.C. § 1693f(e);

e) Attorney's fees and costs pursuant to 15 U.S.C. § 1693m and 15 U.S.C. § 1640;

f) Pre- and post-judgment interest as permitted by law;

g) Actual damages, statutory damages, punitive damages, costs, and attorney's fees pursuant to 15 U.S.C. § 1681n and § 1681o;

h) Such other relief as the Court deems just and proper; and

**JURY TRIAL DEMANDED**

Respectfully Submitted,

Dated: May 1, 2025

/s/     John Z. Steed
John Z. Steed, Esq. #5399
Island Justice
P.O. Box 771
Stonington, ME 04681
(207) 200-7077
john@islandjusticelaw.com