**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **BRENDA VITALIS**<br>    Plaintiff<br><br>v.<br><br>**CPORT CREDIT UNION**<br>    Defendant | CIVIL ACTION NO: 2:25-cv-00217-NT |

**RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS**

Brenda Vitalis responds as follows to the Defendant's Motion to Dismiss.

**I.      INTRODUCTION**

The Plaintiff was the victim of a sophisticated confidence fraud that was only made possible by unauthorized bank transfers she knew nothing about. Fraudsters secretly moved money from Ms. Vitalis' home equity line of credit to her checking account to make it look like she had accidentally been overpaid by tens of thousands of dollars, and then convinced her to "return" the money to them. She ended up with her savings depleted and with tens of thousands of dollars in debt she cannot pay back.

The Fair Credit Billing Act (FCBA) and Electronic Funds Transfer Act (EFTA) place the risk of unauthorized transfers on banks and creditors. The Defendant is both banker and creditor here, but has refused to accept responsibility. The Defendant has also refused to correct its continued inaccurate reporting of the fraudulent charges as legitimate debt, and declines to even

1

note the account as disputed on her credit reports, giving rise to liability under the Fair Credit Reporting Act (FCRA).[1]

## II.    STATEMENT OF THE CASE

This case arises from a classic "refund/overpayment" scam that exploited electronic banking tools and resulted in the loss of $58,000 from Ms. Vitalis's accounts. The Complaint alleges that a fraudster gained remote control of Ms. Vitalis's computer and, "unbeknownst to [her]," used that access to create and enable online banking for her cPort accounts. (ECF 1 ¶¶ 29–33.) Before April 30, 2024, she had never set up or used online banking and "did not know … that she even had online access." (ECF 1 ¶¶ 31–32.) Once the fraudster established that access, he orchestrated a sequence of intrabank movements: on April 30, 2024, $30,000 was advanced from her home-equity line of credit ("HELOC") into her savings account; shortly thereafter, those funds were shifted from savings into checking; and on May 2, 2024, an additional $28,000 HELOC advance was made and likewise moved into her deposit accounts. (ECF 1 ¶¶ 33(a), 33(c).)

The Complaint states that Ms. Vitalis did not authorize any of those electronic fund transfers—neither the HELOC advances nor the internal transfers between deposit accounts—and that she was unaware they had occurred. (ECF 1 ¶ 42.) The internal movements were not ends in themselves; rather, they were the predicate acts of the larger fraud. Having repositioned funds to inflate her checking balance, the fraudster convinced Ms. Vitalis that a $30,000 outside "overpayment" had mistakenly been deposited and had to be returned immediately or that she and the fraudster (who she thought had been helping her) would face consequences. (ECF 1 ¶¶ 36–38.)

---

[1] Ms. Vitalis concedes that her claim for unjust enrichment is not viable at this time because contractual and/or statutory remedies likely exist. She asks that that count be dismissed without prejudice.

As the Complaint explains, "[b]ut for the transfer of $30,000 to her checking account, she would not have believed the fraudster's lie … and she would not have had the funds available to withdraw." (ECF 1 ¶ 37.) The "downstream effect" of the unauthorized transfers was the loss itself: Ms. Vitalis, deceived by the contrived balance, withdrew and "returned" funds that were then stolen. (ECF 1 ¶¶ 36–37.)

Ms. Vitalis soon realized she had been tricked, and she promptly alerted cPort. (ECF 1 ¶ 48.) She gave timely notice of the error and of the unauthorized electronic fund transfers on June 6, 2024, triggering the credit union's duties to acknowledge, investigate, and correct under the Electronic Fund Transfer Act ("EFTA"). (ECF 1 ¶¶ 54–56.) She also lodged credit-reporting disputes and supplied corroborating information, including a police report, to ensure cPort had all relevant facts. (ECF 1 ¶¶ 81–82.)

cPort denied liability. According to the Complaint, the credit union responded with a perfunctory letter asserting that it "bears no liability" without provisionally recrediting the account or conducting a reasonable, good-faith investigation into the unauthorized electronic fund transfers or the reported inaccuracies. (ECF 1 ¶¶ 58–61; see also ¶¶ 83–84 (alleging failures to investigate and to correct inaccurate credit reporting).) The net result was that cPort refused to absorb the loss despite the unauthorized nature and function of the transfers and despite the consumer-protective framework Congress enacted for precisely this kind of technologically-enabled fraud.

## III.    STANDARD OF REVIEW

On a motion to dismiss, the Court accepts all well-pleaded, non-conclusory factual allegations as true, draws all reasonable inferences in the plaintiff's favor, and asks whether those facts, taken together, state a facially plausible claim for relief. *See Ocasio-Hernández v. Fortuño-Burset*,

3

640 F.3d 1, 7–15 (1st Cir. 2011) (explaining the two-step Twombly/Iqbal approach and that an adequate complaint must provide fair notice and state a plausible claim); *id.* at 12 (a complaint must furnish "fair notice" and a "facially plausible" claim); *id.* at 14–15 (error to disregard discrete factual allegations or to parse the complaint piecemeal; the complaint must be read as a whole). The First Circuit has stated that courts must read the complaint holistically, and that there need not be a one-to-one mapping between individual allegations and each element so long as the combined allegations plausibly narrate a claim. *See García-Catalán v. United States*, 734 F.3d 100, 102–05 (1st Cir. 2013) (reversing dismissal where district court applied plausibility "too mechanically"; complaint read "as a whole" provided fair notice and plausibly alleged negligence; modest discovery could supply missing details).

In conducting this inquiry, courts first disregard legal conclusions and threadbare recitals, then assess whether the remaining well-pleaded facts support a reasonable inference of liability. *See García-Catalán*, 734 F.3d at 103 (two-step "pavane"; accept well-pleaded facts, not conclusory labels); *Ocasio-Hernández*, 640 F.3d at 12 (same). The analysis is "context-specific" and does not demand a "high degree of factual specificity." *See Suren-Millán v. United States*, 38 F. Supp. 3d 208, 215–17 (D.P.R. 2013) (synthesizing First Circuit law; court may consider incorporated documents and judicially noticeable facts; cautioning against an overly mechanical plausibility review). Nor does Rule 12 invite trial-stage burdens: the "doors of discovery" open when the complaint supplies enough factual matter to create a reasonable expectation that discovery will reveal evidence of the alleged misconduct. *See Ocasio-Hernández*, 640 F.3d at 19 (quoting *Twombly*); *García-Catalán*, 734 F.3d at 104–05 (same).

4

### IV.     LAW AND ARGUMENT

### A.     Plaintiff Has Plausibly Alleged a Billing Error Under TILA/FCBA

The Truth in Lending Act ("TILA") promotes "the informed use of credit." Pub. L. No. 90-321, 82 Stat. 146 (1968). It requires creditors to provide disclosures and periodic statements and imposes civil liability for noncompliance. *See Lyons v. PNC Bank, N.A.*, 112 F.4th 267 (4th Cir. 2024). Congress later added the Fair Credit Billing Act ("FCBA") to guard against "inaccurate and unfair credit billing and credit card practices." Pub. L. No. 93-495, 88 Stat. 1500 (1974) (codified as amended at 15 U.S.C. §§ 1666–1666j). Under the relevant sections of the FCBA, when a consumer gives proper written notice of a "billing error," the creditor must promptly acknowledge, reasonably investigate, and correct the account (or establish and explain that no billing error occurred), within the statutory timelines. 15 U.S.C. § 1666(a); 12 C.F.R. § 1026.13(b)–(f). The plaintiff alleges a billing error in her complaint and that cPort failed to meet its obligations after she reported it to them.

### 1.     The FCBA standard and elements.

To state a claim under § 1666, a plaintiff must plausibly allege: (1) an "open-end credit plan" (such as a HELOC) for which periodic statements are sent; (2) a "billing error" as defined by § 1666(b) that appeared on a periodic statement; (3) timely written notice within 60 days of the creditor's transmission of the first statement containing the error, identifying the consumer, the account, the amount/date and the reasons for the belief there is an error; and (4) the creditor's failure to comply with § 1666(a)'s duties to acknowledge, investigate, and correct or explain, while observing the statute's temporary restraints (including not treating the disputed amount as delinquent during the investigation). 15 U.S.C. § 1666(a), (b); 12 C.F.R. § 1026.13(b)–(g).

**2.      The Complaint satisfies each element of an FCBA claim**

   a.      *Open-end credit plan / periodic statements*

Plaintiff alleges her HELOC is an "open-end credit plan" within TILA. "The HELOC maintained by Plaintiff is an 'open-end credit plan' as defined by 15 U.S.C. § 1602(i), which qualifies for protections under FCBA when billing errors occur." (ECF 1 ¶ 24.) She further alleges she "received her periodic account statements reflecting the unauthorized transactions … in May of 2024," and that Defendant told her the "transactions appeared on her account statements." (ECF 1 ¶¶ 53, 49.)

   b.      *Billing error on the statement.*

A billing error includes "[a] reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement." 15 U.S.C. § 1666(b)(1). The Complaint alleges two line advances out of the HELOC—"a $30,000 transfer … on April 30, 2024" and "a $28,000 transfer … on May 2, 2024"—that were not made or authorized by Ms. Vitalis. (ECF 1 ¶¶ 33, 42.) It pleads this expressly as a FCBA "billing error": "The transfer from the HELOC without authorization was also a 'billing error' per 15 U.S.C. § 1666(b)(1) because it represented an extension of credit not made by Plaintiff or anyone authorized by Plaintiff." (ECF 1 ¶ 35; see also ¶¶ 93–94.) Those unauthorized extensions increased the HELOC balance and were "reflected on the May billing statement." (ECF 1 ¶ 53.)

   c.      *Timely written notice with required content.*

On June 6, 2024 Plaintiff "sent a written notice to Defendant, outlining the unauthorized nature of the transactions and requesting an investigation in accordance with EFTA and FCBA requirements." (ECF 1 ¶ 54.) The letter "detailed the timeline of events, the fraudulent transactions, and Plaintiff's lack of knowledge or consent," and "complied with the requirements set forth in 15 U.S.C. § 1666(a)." (ECF 1 ¶¶ 55–56; Ex. A.)

d.      *The creditor's noncompliance with § 1666(a).*

Rather than acknowledging error and correcting the account or providing a substantively supported explanation after a reasonable investigation, Defendant "responded by denying liability" on June 27, 2024, asserting the transactions were "authorized because they were initiated through Plaintiff's online banking portal," and that it "b[ore] no responsibility." (ECF 1 ¶¶ 58–60; Ex. B.) Plaintiff alleges Defendant failed to conduct a good-faith investigation and continue[d] to hold Plaintiff liable for fraudulent charges, in violation of the FCBA. (¶¶ 93–95.) Those allegations, accepted as true, plausibly plead the procedural noncompliance § 1666(a) forbids.

**3.      Defendant's Arguments misread § 1666(b)(1).**

Defendant argues that the only relevant "extension of credit" was the historical opening of the HELOC. This mistakes the law. The Supreme Court has explained that TILA's use of "extension of credit" in this context "applies to both the opening of accounts and the use of credit on those accounts." *Am. Exp. Co. v. Koerner*, 452 U.S. 233, 240–41 (1981) (emphasis added). As *Koerner* puts it, credit is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," so a creditor extends credit not only when it opens or renews an account "but also when the cardholder actually uses the [account] to make purchases." *Id.* (cleaned up). Here, the "use" of the HELOC—the $30,000 and $28,000 advances reflected on the May statement—are the "extension[s] of credit" that § 1666(b)(1) addresses. (ECF 1 ¶¶ 33(a), 33(c), 53.) And the Complaint alleges, in plain terms, that those extensions were not made by the obligor: "Plaintiff did not authorize the transfer of funds from her HELOC to her savings account, nor did she authorize the subsequent transfer of funds to her checking account." (ECF 1 ¶ 42.)

The Complaint alleges (1) an open-end HELOC with periodic statements (ECF 1 ¶¶ 24, 49, 53); (2) a billing error under § 1666(b)(1) reflected on a statement—unauthorized HELOC extensions of $30,000 and $28,000 (ECF 1 ¶¶ 33(a), 33(c), 35, 42, 53); (3) timely, detailed written

notice within 60 days (ECF 1 ¶¶ 54–56, Ex. A); and (4) the creditor's failure to comply with § 1666(a)'s investigation and correction duties (ECF 1 ¶¶ 58–60, 93–95). That is more than sufficient to state a prima facie FCBA claim. Defendant's motion to dismiss Count III should be denied.

**B.      Plaintiff has Plausibly Alleged a Violation of the Electronic Funds Transfer Act**

**1.      The Electronic Funds Transfer Act**

Congress enacted the Electronic Fund Transfer Act ("EFTA") in 1978 to protect consumers using electronic payment systems. *See* 15 U.S.C. § 1693 (Congressional findings and purpose); *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115–16 (2d Cir. 2020) (EFTA's "primary purpose was to protect consumers in the then-novel context of electronic payment systems"). "Congress was concerned that consumers would not understand the technologies they were using and would be susceptible to sophisticated frauds as a result, and it determined that financial institutions were better positioned to shoulder the risk of those frauds." *New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 519 (S.D.N.Y. 2025), *motion to certify appeal granted*, No. 24-CV-659 (JPO), 2025 WL 1194377 (S.D.N.Y. Apr. 22, 2025).

**2.      EFTA Standard and Elements**

An EFTA claim is stated by alleging (i) an "unauthorized" electronic fund transfer as defined in 15 U.S.C. § 1693a(12) or an "incorrect electronic fund transfer to or from a consumer's account" under § 1693f(f)(2), (ii) that the transfer appeared on a periodic statement, (iii) timely written notice to the institution, and (iv) non-compliance with § 1693f's duties to acknowledge, investigate, provisionally recredit when required, and correct or explain. See 15 U.S.C. §§ 1693f(a)–(c), (f)(1)–(2). The Complaint alleges that a fraudster, after gaining remote access, "set up online banking" without Ms. Vitalis's knowledge and initiated $30,000 and $28,000 transfers from her HELOC to savings

and then to checking (ECF 1 ¶¶ 29–33); that before April 30, 2024 she had "never set up or used online banking" and "did not know" she even had online access (ECF 1 ¶¶ 31–32); that she "did not authorize" those transfers and "received no benefit" from them because they were the predicate for the scam (ECF 1 ¶¶ 36–37, 42); and that the transactions appeared on her May 2024 statements (id. ¶ 53), after which she sent timely written notice on June 6, 2024 (ECF 1 ¶ 54).

After notice, cPort denied liability as "authorized," did not provisionally recredit, and failed to conduct a good-faith, reasonable investigation or otherwise correct or explain within EFTA's timelines. See 15 U.S.C. § 1693f(c); ECF 1 ¶¶ 58–61. Those facts plausibly plead violations of § 1693f for both unauthorized transfers (§ 1693f(f)(1), incorporating § 1693a(12)) and, independently, incorrect transfers (§ 1693f(f)(2)). The more granular "benefit" question is addressed below; at Rule 12, these well-pled allegations are more than sufficient.

3.      **Ms. Vitalis did not Benefit from Being Scammed out of $58,000, nor from the Transfers that Enabled the Scam.**

cPort's argument hinges on a narrow reading of the term "unauthorized electronic fund transfer." An "unauthorized" transfer is a "transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12) (emphasis added).

The Act does not define "benefit," so courts give the term its ordinary meaning. *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *New York by James v. Citibank, N.A.*, 2025 WL 251302, at *16 (S.D.N.Y. Jan. 21, 2025) ("In other words, a 'benefit' improves the position of the recipient in some way."). Black's defines "benefit" as "advantage; profit; fruit; privilege," and Webster's (1961) as "something that guards, aids, or promotes well-being," an "advantage" or "useful aid." *Citibank*, 763 F. Supp. 3d at 524.

9

cPort asserts, without citation or development, that because the HELOC-to-savings and savings-to-checking transfers were "made to checking and savings accounts in Plaintiff's name," she "benefited." MTD at 5. Courts that have addressed this argument in the context of frauds and thefts and have uniformly rejected it.

In *Moore v. JPMorgan Chase Bank, N.A.*, fraudsters first shifted funds from the plaintiffs' savings to checking and then sent unauthorized wires that drained the account. No. 22-cv-01849-JSC, 2022 WL 16856105, at *1 (N.D. Cal. Nov. 10, 2022). The bank argued EFTA did not apply to the intra-bank transfers between the savings and checking accounts because the money "moved between the plaintiffs' own accounts." *Id.* at *2*. The court disagreed: "without the unauthorized (and unknown) transfer of money from their savings to their checking account there would not have been sufficient monies in the checking account to fund the unauthorized (and unknown) wire transfers. Such a consequence is a detriment, not a benefit." *Id.* (cleaned up) (citing *Park v. Webloyalty.com, Inc.*, 685 F. App'x 589, 592 (9th Cir. 2017))(emphasis added).

*Citibank* adopts the same framework and labels the key inquiry the transfer's "downstream effect:" did the transfer confer a real advantage, or did it merely facilitate theft? *Citibank* draw on *Aikens*, which dealt with a transfer, without written authorization, by a debt collector from a consumer's account to pay down a credit card debt. *Citibank*, 2025 WL 251302, at *17* (citing *Aikens v. Portfolio Recovery Associates, 716 F.App'x 37, 40 (2d Cir. 2017) (summary order))*. In *Aikens,* the court looked to the end result of an allegedly unauthorized transfer for whether there was a benefit and found that the transfer had had "the decided benefit of reducing her debt" when a transfer pays down her credit card balance. *Id.* But the fraud cases are the mirror-image: unauthorized transfers that consolidate or reposition funds solely to enable the loss are not a "benefit" because they degrade the consumer's position. *See id.*; *Moore*, 2022 WL 16856105, at *1*. Likewise, *Wingard v. TBK*

10

*Bank* rejected the idea that ephemeral account-to-account movements are a "benefit," emphasizing that even if there were a momentary increase in a balance, the plaintiffs were unaware of it and it served only as an "intermediate step that led to" the theft. 2025 WL 605265, at *3–4 (D. Colo. Feb. 25, 2025).

Those principles track the pleaded facts here. The Complaint alleges that, after a fraudster gained remote control of Ms. Vitalis's computer, "unbeknownst to [her]," he "set up online banking access" and executed the transfers (ECF 1 ¶¶ 29–33); that before April 30, 2024 she "had never set up or used online banking" (ECF 1 ¶ 31) and "did not know … that she even had online access" (ECF 1 ¶ 32); that she "did not authorize the transfer of funds from her HELOC to her savings account, [or] the subsequent transfer … to her checking account" (ECF 1 ¶ 42); and—critically—that she "received no benefit" from those transfers and "was harmed by" them because they were the indispensable setup for the scam. (ECF 1 ¶¶ 36–37 (explaining that "[b]ut for the transfer of $30,000 to her checking account, she would not have believed the fraudster's lie … and she would not have had the funds available to withdraw").) That is the very definition of a non-beneficial, unauthorized EFT under § 1693a(12).

cPort's reading produces absurd results. If any ledger increase—even one created by simultaneously increasing the consumer's debt—counts as a "benefit," then even a net-negative movement (e.g., $30,000 out of a HELOC but only $20,000 into a deposit account) would still be a "benefit[2]" because of the deposit side of the entry. That makes "benefit" turn on an isolated analysis removed from substance, a rule that "flies in the face of common sense." *Wingard*, 2025 WL 605265, at *3*. EFTA's consumer-protective purpose does not tolerate that accounting

---

[2] Regardless, the transactions are at best neutral and provide no net benefit.

fiction. See *Citibank*, 2025 WL 251302, at *12* (EFTA protects "consumers from sophisticated, technological frauds"); *Webloyalty*, 954 F.3d at 116.

Finally, even apart from "benefit," Plaintiff separately pleaded violations of § 1693f(f)(2): the fraudster's intrabank movements were "incorrect electronic fund transfer[s] to or from" her accounts, triggering cPort's investigation and correction duties. (ECF 1 ¶ 33 (invoking § 1693f(f)(2)); ¶¶ 54–56 (timely written notice on June 6, 2024); ¶¶ 58–61 (denial of liability; failure to provisionally recredit and to conduct a good-faith investigation).)

Because the Complaint plausibly alleges unauthorized—and, independently, incorrect— electronic fund transfers that appeared on Plaintiff's statements and timely, detailed notice to cPort, and because cPort failed to meet its § 1693f obligations thereafter, the motion to dismiss the EFTA claim should be denied.

**C.      Plaintiff States a Plausible Claim Under the Fair Credit Reporting Act**

**1.      The Fair Credit Reporting Act**

Congress enacted the Fair Credit Reporting Act ("FCRA") to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007). To accomplish that, the statute regulates not only consumer reporting agencies (Experian, Equifax, Transunion, etc.) ("CRAs") but also the furnishers that supply account information to CRAs (banks, credit unions, lenders, and debt collectors). See 15 U.S.C. § 1681s-2. The FCRA gives consumers a private right of action to recover for negligent (§ 1681o) or willful (§ 1681n) noncompliance; and while some FCRA duties are

12

enforced only by regulators, others are privately enforceable after a consumer lodges a dispute with a CRA and the CRA notifies the furnisher.

**2.        Plaintiff's Complaint seeks Relief for Violations of § 1681s-2(b), not § 1681s-2(a)**

Section 1681s-2(a) imposes front-end duties on furnishers (e.g., initially furnishing accurate information and updating it when they learn it is inaccurate). There is no private cause of action for simply failing to furnish accurate information as required by subsection (a). 15 U.S.C. § 1681s-2(c), (d); *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 35–36 (1st Cir. 2010) (recognizing that subsection (a) is enforced by government officials, not consumers).

"Under § 1681s–2(b) there is a private cause of action" *Chiang*, 595 F.3d at 26.  Section 1681s-2(b) imposes duties on furnishers after a consumer disputes an item with a CRA and the CRA notifies the furnisher of the dispute. After notice of a consumer dispute from the CRA arrives, the furnisher must: (1) conduct a "reasonable investigation;" (2)review all relevant information provided by the CRA; (3) report the results to the CRA; and (4)/(5) correct, delete, or block any information found to be inaccurate or incomplete (including information reported in a materially misleading way). 15 U.S.C. § 1681s-2(b)(1)(A)–(E). Claims for violating these duties are privately enforceable under §§ 1681n and 1681o. *Id.* at 35–37 (adopting a reasonableness standard for § 1681s-2(b) investigations); see also *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 615–19 (6th Cir. 2012) (detailing furnisher duties, private right, and reasonableness).

Plaintiff's claim is under § 1681s-2(b). She challenged Defendant's reporting with CRAs (and in writing to the furnisher itself); the CRAs notified Defendant; and Defendant then failed to reasonably investigate and correct—or even note—the dispute, while continuing to furnish inaccurate and materially misleading information. (ECF 1 ¶¶ 79–86).

13

3.      **Elements of a § 1681s-2(b) Furnisher Claim**

A furnisher-liability claim under § 1681s-2(b) requires allegations that: 1) Plaintiff disputed the information with a CRA; 2) The CRA notified the furnisher of the dispute; 3) The furnisher then failed to carry out its § 1681s-2(b) duties—e.g., no reasonable investigation, failure to review all relevant information, report the results of the investigation, and failure to correct, delete, or block information that was inaccurate or materially misleading; and 4) Plaintiff suffered damages caused by that noncompliance. *Chiang*, 595 F.3d at 35–41 (reasonableness standard; private enforcement of (b)); see also *Saunders v. Branch Banking & Tr. Co.*, 526 F.3d 142, 148–51 (4th Cir. 2008) and *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162–64 (9th Cir. 2009).

4.      **Plaintiff Plausibly Pleads Each Element of a § 1681s-2(b) Furnisher Claim**

a.      *Dispute to CRAs and Notice to Furnisher.*

Plaintiff disputed the reporting with Equifax and TransUnion in December 2024. (ECF 1 ¶ 81.) The Complaint alleges that those CRAs notified Defendant as § 1681i(a)(2) requires. (ECF 1 ¶ 82.) She also sent detailed disputes directly to Defendant on June 6, 2024, and again on March 18, 2025—telling Cport: "Please stop reporting this… Please report what actually happened… Please remove this from my credit report." (ECF 1 ¶¶ 79–80 (Ex. C quoted)) Those allegations satisfy the CRA-dispute/notice trigger at this stage.

b.      *Failure to Conduct a Reasonable Investigation; Failure to Review All Relevant Information; Failure to Report the Results of the Investigation; Failure to Delete the Item of Information After it Could Not Be Verified.*

14

Despite detailed, written disputes—and a police report made available to CPort—Defendant "failed to conduct a reasonable investigation" and to "review all the information" provided by the CRAs. (ECF 1 ¶ 84(a)–(b), ¶ 86(b). Instead, CPort continued to report the HELOC as a current, undisputed obligation. (ECF 1 ¶¶ 58–60, 85(b), 87(a)–(b).) The Complaint, however, alleges that the charges were not authorized and that they were fraudulent and that Ms. Vitalis did not owe the money. The Complaint also alleges that the police report Ms. Vitalis filed was made available to cPort. (ECF 1 ¶ 86(b)). These facts, taken as true, support the reasonable inference and give fair notice of a claim that cPort's investigation was not reasonable. See *Chiang*, 595 F.3d at 35–37 (reasonableness); *Boggio*, 696 F.3d at 616–19 (investigation must be "fairly searching"). If the investigation had been reasonable, cPort would have concluded, as alleged in the Complaint, that the charges were fraudulent and that cPort, not Ms. Vitalis was liable for the charges.

  c.   *Continuing to Furnish Inaccurate or Materially Misleading Information; Failure to Correct or Note the Dispute.*

Plaintiff alleges Defendant kept furnishing the HELOC as a legitimate, "Current: Paid or Paying as Agreed" account—without indicating it was disputed—even after notice of the fraud and multiple written disputes. (ECF 1 ¶ 85(b), ¶ 83(b), ¶ 84(d).) She further alleges that the reported balance included unauthorized charges arising from fraudsters who obtained remote access to her computer (a fact CPort itself acknowledged). (ECF 1 ¶ 85(a), ¶ 85(d), ¶ 86(d).) Those allegations plausibly plead reporting that is inaccurate (inflated by fraud) or, at minimum, materially misleading for omitting that the account is disputed—scenarios courts have held falls within § 1681s-2(b). See *Saunders*, 526 F.3d at 148–51 (furnisher's "decision to report the debt without any mention of a dispute was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect.'").

>   *d.*    *Damages*

Plaintiff pleads concrete injuries: credit-score and pricing harms (including being "required to take a higher interest rate on the fraudulently obtained HELOC balance"), reputational harm, emotional distress with physical manifestations (loss of sleep, anxiety, gastrointestinal symptoms), and out-of-pocket dispute expenses. (ECF 1 ¶ 89(a)–(e), ¶ 67.)

**5.    Defendant's Counter-Arguments Fail**

First, the Defendant says, incorrectly that the Complaint is for a § 1681s-2(a) claim. Plaintiff expressly alleges and seeks redress for the post-dispute, post-notice duties of § 1681s-2(b): failure to reasonably investigate, failure to review all relevant information, and continued furnishing of inaccurate or materially misleading information (including failure to note the dispute). (ECF 1 ¶¶ 83–86.)

Second, cPort says there is no allegation of inaccuracy. The Complaint alleges the HELOC advances were the product of a fraud scheme, not Plaintiff's authorization or use, and therefore not a legitimate debt of Plaintiff. (ECF 1 ¶¶ 29–37, 42.) It further alleges that cPort furnished credit-report information that incorporated those fraud-driven amounts and failed to characterize the account as disputed after detailed written disputes to both cPort and the CRAs and after the CRAs reported the dispute to cPort. (ECF 1 ¶¶ 54–56, 79–83.) Plaintiff pleads that cPort told her it "bears no liability" and that the transfers were "authorized," even while acknowledging she was "one of the many people who fall victim to fraudsters every day." (ECF 1 ¶¶ 58–60, 86(d).) Those facts squarely allege inaccurate (or, at minimum, materially misleading) furnishing.

16

The Complaint also specifies *how* the reporting was inaccurate: the reported HELOC balance "included charges that were the result of unauthorized transactions initiated by fraudsters, not legitimate debt;" cPort "reported the account as a legitimate debt obligation of Plaintiff" and as "Current: Paid or Paying as Agreed," rather than reporting it as disputed; and cPort "failed to indicate that the increased balances resulted from unauthorized access to Plaintiff's online banking." (ECF 1 ¶ 85(a)–(d).) Taken together with the allegations that the fraudulent transfers appeared on statements and were timely and repeatedly disputed (ECF 1 ¶¶ 49, 53–56, 79–83), Plaintiff has more than plausibly alleged inaccurate (or materially incomplete) reporting under the FCRA.

At a minimum, failing to mark the account as disputed rendered the reporting materially misleading, which fits squarely within § 1681s-2(b)(1)(D)/(E). *Saunders*, 526 F.3d at 148–51; *Gorman*, 584 F.3d at 1163–64 ("a consumer's failure to pay a debt that is not really due "does not reflect financial irresponsibility," and thus the omission of the disputed nature of a debt could render the information sufficiently misleading so as to be "incomplete or inaccurate" within the meaning of the statute."). To the extent a more detailed pleading is necessary, Plaintiff can amend her complaint.

In short, Defendant's argument assumes there were no inaccuracies to investigate and that the charges were authorized, so they are accurate. But the Complaint alleges the opposite: the charges were unauthorized, reported as if they were valid, and dismissed out of hand despite Plaintiff's disputes. At this stage, those facts easily state a claim under § 1681s-2(b). Defendant's motion should be denied.

## V.    CONCLUSION

For the foregoing reasons, the Plaintiff asks that the Defendant's Motion to Dismiss as to Count I (EFTA), Count II (FCRA), and Count III (TILA/FCBA) be denied. Plaintiff concedes that

her unjust enrichment claim should be dismissed without prejudice, based on further review of the

relevant law, as the parties have a contractual and/or statutory remedy.


Respectfully Submitted,


Dated: August 20, 2025                      /s/____John Z. Steed_____
                                            John Z. Steed, Esq. #5399
                                            Island Justice
                                            P.O. Box 771
                                            Stonington, ME 04681
                                            (207) 200-7077
                                            john@islandjusticelaw.com

18