UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| BRENDA VITALIS, | ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) | No. 2:25-cv-00217-LEW |
| CPORT CREDIT UNION, | ) ) ) | |
| Defendant | ) | |

**ORDER ON MOTION TO DISMISS**

In this action, Plaintiff Brenda Vitalis sues Defendant cPort Credit Union for alleged violations of the Electronic Fund Transfer Act, the Fair Credit Reporting Act, and the Fair Credit Billing Act. The matter is before the Court on Defendant's Motion to Dismiss (ECF No. 7).

**Plaintiff's Allegations**

The following facts are drawn from the Complaint and its attachments. In the spring of 2024, Plaintiff Brenda Vitalis ("Plaintiff") fell victim to a form of overpayment scam and lost $58,000 to unknown criminals. The scam involved an April 30, 2024, telephone communication in which the fraudster persuaded Plaintiff that there had been an unauthorized transaction in which $599 was paid to a GoFundMe account from her PayPal account. The fraudster claimed to be a representative of PayPal and offered to refund the money to Plaintiff in two transfers of $300. Thinking she was acting in her own best interest, Plaintiff agreed to install software on her personal computer that gave the fraudster

remote access, and from there the fraudster set up online banking access for Plaintiff's accounts with Defendant cPort Credit Union ("Defendant").[1] At the time, Plaintiff had three accounts with Defendant: a home equity line of credit ("HELOC"), a savings account, and a checking account. Prior to April 30, 2024, Plaintiff had never signed up for online access to her accounts.

After setting up online access to Plaintiff's accounts, and without Plaintiff's knowledge, the fraudster executed transactions that resulted in an extension of credit from the HELOC to the savings account in the amount of $30,000, followed by a transfer of the $30,000 from the savings account to the checking account. Later that day, the fraudster contacted Plaintiff a second time and reported that a mistaken overpayment had occurred. The fraudster told Plaintiff that instead of wiring her $300, the fraudster mistakenly wired $30,000. He asked Plaintiff to help him recover the overpayment by withdrawing money from her checking account and depositing it in a certain ATM machine. Plaintiff complied with this request.

Having executed one successful scam against Plaintiff, the fraudster contacted her once more, a couple of days later, and repeated the fraud. Once again, Plaintiff saw excess money in her checking account, without realizing that it was deposited there through the fraudster's use of Defendant's online banking system to make another advance against

---

[1] Plaintiff alleges that she "did what the fraudster asked" and that she "did not know what the fraudster was doing." Compl. ¶¶ 29-30. In a letter to Defendant that is Exhibit A to the Complaint, Plaintiff reported that the fraudster told her that she would need to set up online banking to pay the money back and that she set up online banking with the fraudster's help. Compl. Ex. A.

Plaintiff's HELOC. Once again, Plaintiff withdrew a large quantity of cash and deposited it in an ATM at the fraudster's direction.

On May 8, 2024, Plaintiff visited one of Defendant's branch offices and reported what she then considered suspicious activity. Defendant informed her that the money in her checking account had come from her HELOC and not from an outside deposit. Realizing that she was a victim of fraud, Plaintiff reported the fraud to local law enforcement and asked Defendant to help her rectify the situation.

Sometime shortly thereafter, Plaintiff received a periodic account statement that reflected the account activity associated with the fraud. On June 6, 2024, Plaintiff sent a notice to Defendant in which she asserted that the transactions were unauthorized and requested that Defendant perform an investigation. Compl. ¶ 54 & Compl. Ex. A. On June 27, 2024, Defendant responded. Defendant denied liability for Plaintiff's loss and provided its response to certain legal contentions made by Plaintiff and/or her counsel. Compl. ¶ 58 & Compl. Ex. B. I do not relate the legal contentions here but will discuss them below.

## DISCUSSION

Plaintiff proceeds on three counts.[2] In Count I, Plaintiff alleges that Defendant violated the Electronic Fund Transfer Act, 15 U.S.C. § 1693f, by:

a) Failing to investigate and resolve the unauthorized electronic fund transfers initiated by the fraudster.

b) Failing to provisionally recredit Plaintiff's account within ten business days of receiving notice of the unauthorized transfers.

---

[2] Plaintiff voluntarily dismisses her fourth count, a state law claim of unjust enrichment. Although Defendant asks that the dismissal be with prejudice, pursuant to Rule 41 I will dismiss Count IV without prejudice. Fed. R. Civ. P. 41(a)(1).

      c) Misclassifying the fraudulent transactions as authorized transfers despite clear evidence of unauthorized access and control by the fraudster.

      d) Refusing to credit the Plaintiff the funds that were transferred without her permission.

Compl. ¶ 69.

In Count II, Plaintiff alleges that Defendant violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2, by furnishing inaccurate information to credit reporting agencies, failing to investigate the accuracy of the information when Plaintiff challenged it, and failing to inform credit reporting agencies that the reported information was disputed. *Id.* ¶¶ 83-84.

In Count III, Plaintiff alleges that Defendant violated the Fair Credit Billing Act, 15 U.S.C. § 1666, by failing to investigate and failing to correct a "billing error," including by crediting her the money she lost. *Id.* ¶¶ 93-94.

Defendant asserts that none of the three counts states a claim for which relief may be granted, for certain statute-specific reasons that will be addressed below.

To avoid dismissal Plaintiffs must provide "a short and plain statement of the claim showing [they] are entitled to relief." Fed. R. Civ. P. 8(a)(2). In practice, this means Plaintiffs' Complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In applying this standard, the Court will accept factual allegations as true and consider whether the facts, along with reasonable inferences that may arise from them, describe a plausible, as opposed to merely conceivable, claim. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st

Cir. 2011); *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010). But the Court need not credit conclusory statements that merely recite elements of the claim. *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) ("We do not credit legal labels or conclusory statements, but rather focus on the complaint's non-conclusory, non-speculative factual allegations and ask whether they plausibly narrate a claim for relief.").

**A.     Count I**

In support of passage of the Electronic Funds Transfer Act ("EFTA"), Congress offered certain findings and purposes. Congress found that "the use of electronic systems to transfer funds provides the potential for substantial benefits to consumers[,]" but "due to the unique characteristics of such systems, the application of existing consumer protection legislation [was] unclear." 15 U.S.C. § 1693(a). Accordingly, Congress purposed "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems" with a primary focus on "the provision of individual consumer rights." *Id.* § 1693(b). Congress also conferred regulatory authority over the resulting legislative scheme to the Board of Governors of the Federal Reserve System and the Bureau of Consumer Financial Protection. *Id.* § 1693b(a).

The EFTA sets out various standards for "electronic fund transfers"[3] and, for present purposes, includes provisions governing "[d]ocumentation of transfers," "[e]rror

---

[3] Subject to certain exclusions that do not apply in this case, "the term 'electronic fund transfer' means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an

5

resolution," "[c]onsumer liability," and financial institution liability. *Id.* §§ 1693d, 1693f, 1693g, 1693h. Non-compliance with the EFTA exposes a financial institution to liability for the consumer's actual damages, liquidated damages, plus costs and a reasonable attorney's fee. *Id.* § 1693m(a).

In section 1693d, the EFTA imposes a documentation requirement through which financial institutions must provide specific information about electronic transfers, including periodic statements. In section 1693f, the EFTA sets up a process for error resolution. When adequately notified by a consumer of an alleged error concerning an electronic fund transfer, "the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." *Id.* § 1693f(a). Where errors are found, a prompt correction is required (within one business day). *Id.* § 1693f(b). If the financial institution elects not to resolve the matter within ten business days, it must "provisionally recredit" the account in question pending the conclusion of its investigation. *Id.* § 1963f(c). In any event, it must investigate and make its determination on the alleged error within 45 days. *Id.* When the financial institution finds no error, it must provide the consumer with "an explanation of its findings within 3 business days after the conclusion of its investigation." *Id.* § 1693f(d). Failure to comply exposes a financial institution to liability for actual damages or an amount not less than $100 nor greater than $1,000, which may in some cases by trebled. *Id.* § 1693f(e), 1693m(a).

---

account." 15 U.S.C.A. § 1693a(7). Under this definition, the movement of funds between an account holder's accounts with the same financial institution is an electronic fund transfer.

"Acts constituting errors" include "an unauthorized electronic fund transfer." *Id.* § 1693f(f)(1). The definition of "unauthorized electronic fund transfer" is as follows:

> [A]n electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit, but the term does not include any electronic fund transfer (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution.

*Id.* § 1693a(12). A consumer's liability for an unauthorized electronic fund transfer is limited by, and "a consumer incurs no liability from an unauthorized electronic fund transfer" except as provided in, section 1693g of the EFTA.

In her Complaint, Plaintiff alleges harm as the result of Defendant's alleged non-compliance with the EFTA's error resolution provision. She alleges that Defendant did not conduct a good faith investigation, failed to provisionally recredit her account within ten days, wrongly determined that there was no error, and, ultimately, should have absorbed the loss.

In its Motion to Dismiss, Defendant argues that the claim should be dismissed because the loss Plaintiff suffered was not the product of an unauthorized electronic fund transfer. More specifically, Defendant maintains that by a natural reading of the statute and the Bureau's Regulation E, 12 C.F.R. Part 1005, it cannot be found that Plaintiff "receive[d] no benefit" from the electronic fund transfers because all of the electronic fund transfers at issue involved the movement of funds between Plaintiff's own accounts. *See*

15 U.S.C. § 1693a(12) (defining an unauthorized electronic fund transfer as one "initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit."). Defendant argues, in effect, that what Congress meant by "receives no benefit" is "suffered a loss," and that a transfer that does not produce the loss for which the consumer seeks reimbursement does not count as unauthorized. *See* Mot. at 5 ("Here, the transfers that Plaintiff disputes were made to checking and savings accounts in Plaintiff's name and ownership; thus, those transfers are not 'unauthorized' transfers because Plaintiff benefited from those transactions.").

In response, Plaintiff argues that "receives no benefit" must receive its ordinary meaning and that in fact she received no benefit from the transfer of funds out of the HELOC account or from the savings account to the checking account, even if it is also the case that she suffered no immediate loss due to the mere movement of funds in her accounts. Resp. at 9-10 (ECF No. 10).

"Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Because it is entirely possible for an individual to suffer no loss and yet receive no benefit from a transaction, I am persuaded by Plaintiff that Defendant's proposed construction concerning the "receives no benefit" phrase is incorrect. When one considers the circumstances alleged, it is apparent that the movement of funds between or among Plaintiff's accounts conferred no benefit on her. *See Wingard v. TBK Bank, SSB*, 768 F. Supp. 3d 1282, 1287-88 (D. Colo.

8

2025); *New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 523-24 (S.D.N.Y. 2025), *motion to certify appeal granted,* 2025 WL 1194377 (S.D.N.Y. Apr. 22, 2025). Accordingly, Plaintiff has properly alleged the occurrence of unauthorized transfers.[4]

However, the issue remains whether it matters, for purposes of financial institution liability, that Plaintiff did not realize her loss as a direct consequence of the unauthorized electronic fund transfers, but rather as a consequence of her independent withdrawals of cash from her checking account and deposit of the same in an ATM. On this issue Defendant argues: "Even setting aside the definition of 'unauthorized' transfers, Plaintiff suffered no loss as a result of the allegedly fraudulent transfers made to her savings and checking accounts. . . . Plaintiff does not contend, nor could she, that her own cash withdrawals are subject to Reg. E." Mot. at 5. On this issue, Plaintiff is silent but by implication seems to take the position that it does not matter because unauthorized electronic fund transfers were essential to the scam. Resp. at 8-12.

"[T]he EFTA does not hold banks liable for transfers . . . made with the customer's authorization." *Cook v. USAA Fed. Sav. Bank*, No. 8:22-cv-01469, 2023 WL 3949735, at *2 (D. Md. June 12, 2023) (citing *Illsley v. Truist Bank*, No. 5:23-CV-00097, 2023 WL 3690094, at *2 (E.D.N.C. May 26, 2023); *Wilkins v. Navy Fed. Credit Union*, No. 22-cv-02916, 2023 WL 239976, at *19 (D.N.J. Jan. 18, 2023); *Farrish v. Navy Fed. Credit Union*, No. 16-cv-01429, 2017 WL 4418416, at *5 (D. Md. Oct. 5, 2017), *aff'd*, 711 F. App'x 189

---

[4] I do not reach Defendant's argument that a transfer of funds out of Plaintiff's HELOC is not subject to the EFTA. *See* Reply at 3 n.2 (ECF No. 14). The funds also moved between Plaintiff's savings and checking accounts, so the argument is not dispositive.

(4th Cir. 2018). While I agree with Plaintiff that the electronic fund transfers at issue in this case were unauthorized, the subsequent withdrawals of cash and deposits in the ATM were Plaintiff's own acts and, ultimately, the essential cause of her loss. It would be a strange application of the EFTA if a consumer would be denied recovery for losses caused by electronic fund transfers she authorized but would be allowed a recovery for losses caused by cash withdrawals and ATM deposits carried out with personal agency. The EFTA does not concern cash withdrawals and cash deposits.[5] Under the circumstances, I agree with Defendant that a recovery for such a loss is not available through the EFTA.

Despite the foregoing, Plaintiff could still have a claim under the EFTA based on the timing of Defendant's response to her claim of error. Such a claim would not involve actual damages, but could give rise to an award not less than $100 nor more than $1000, which in theory might be trebled. 15 U.S.C. § *Id.* §§ 1693f(e), 1693m(a). As alleged, Plaintiff notified Defendant of errors on June 6, 2024, but Defendant did not respond until June 27, 2024, without provisionally recrediting Plaintiff's account within ten days. I do

---

[5] Under the EFTA, an "'electronic fund transfer' means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). "Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone." *Id*. Although this case involves ATM transactions, the ATM transactions were authorized by Plaintiff since she performed them herself. *See, e.g., Chen v. Bank of Am., N.A.*, No. 25-cv-03790, 2025 WL 2968023, at *2 (N.D. Cal. Oct. 20, 2025) ("When consumers are induced by a fraudster to initiate a transfer, that transfer is not 'unauthorized' under the EFTA."). In any event, there is no allegation that Defendant is responsible for the ATM transactions.

not dismiss Count I in its entirety because the allegations state a plausible failure to comply with all of the requirements of the EFTA's error resolution process.[6]

**B.    Count II**

Congress enacted the Fair Credit Reporting Act ("FCRA") "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). The FCRA imposes duties on credit reporting agencies (sometimes "CRA") as well as "furnishers" of credit reports. *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 34-35 (1st Cir. 2010). For present purposes, Defendant is a furnisher under the FCRA because it supplied one or more credit reporting agencies with data concerning Plaintiff's use of credit, specifically the HELOC debt generated by the fraud.

Under the FCRA, "furnishers may not provide inaccurate information to consumer reporting agencies, 15 U.S.C. § 1681s–2(a)(1), and also have specific duties in the event of a dispute over furnished information, *id*. § 1681s–2(b)." *Id.* at 35. "Only the second of these duties is subject to a private cause of action." *Id.* "When a customer disputes credit information to a CRA, the CRA must advise the furnisher of that data that a dispute exists and provide the furnisher with 'all relevant information regarding the dispute that the agency has received from the consumer.'" *Id.* (quoting 15 U.S.C. § 1681i(a)(2)(A)). Upon notification, the furnisher is required to:

(A) conduct an investigation with respect to the disputed information;

---

[6] The claim that survives would also include Plaintiff's claim that the transfers were "incorrect." *See* Resp. at 12 (citing Compl. ¶ 33 & 15 U.S.C. § 1693f(f)(2)).

(B) review all relevant information provided by the consumer reporting agency....;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation ..., for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—(i) modify that item of information; (ii) delete that item of information; or (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s–2(b)(1).

Liability arising from a furnisher's investigation of a consumer dispute is subject to an objective reasonableness standard. *Chiang*, 595 F.3d at 37. Although an investigation "is meant to determine if the disputed information is 'incomplete or inaccurate[,]' [m]ere incompleteness . . . is not enough; the incompleteness must be such as to make the furnished information misleading in a material sense." *Id.* at 36-37. Additionally, for a consumer to succeed on a claim against a furnisher, she must demonstrate the existence of an "actual inaccuracy," such that the furnisher's alleged failure to reasonably investigate resulted in a "failure to discover inaccuracies in [an] account." *Id.* at 37. Furthermore, "a plaintiff's required showing is *factual* inaccuracy, rather than the existence of disputed legal questions." *Id.* at 38 (emphasis in original). Assuming the showing is made, the FTCA allows for recovery of "actual damages for negligent violations, 15 U.S.C. § 1681o(a)(1),

12

and actual or statutory and punitive damages for willful ones, *id.* § 1681n(a)(1)-(2)." *Id.* at 34.

Plaintiff alleges in Count II that she sent letters to Equifax and TransUnion in which she disputed the accuracy of the HELOC account information reported by Defendant. Compl. ¶ 81. She alleges that Defendant received notice of the dispute and thereafter violated section 1681s-2(b) by failing to conduct a reasonable investigation and ultimately continuing to report the HELOC debt as outstanding. *Id.* ¶¶ 82, 84. She alleges that Defendant was required to report that the debt was the product of "unauthorized transactions initiated by fraudsters" rather than "legitimate debt incurred by Plaintiff," or at least to report the debt as subject to dispute. *Id.* ¶¶ 85, 87. Plaintiff further alleges that Defendant's conduct was "willful" because it knew that she was the victim of a fraud. *Id.* ¶¶ 86, 87.

Defendant argues that Count II must be dismissed because an exhibit attached to the Complaint demonstrates that Defendant conducted an investigation and because Plaintiff has not alleged facts that would demonstrate that Defendant reported inaccurate information. Mot. at 6 & n.2 (citing Compl. Ex. B). Plaintiff maintains, however, that the reporting is inaccurate because she does not owe the money or Defendant has not even noted the existence of a dispute. Resp. at 15-17. She cites authority that an incomplete report can generate liability for a furnisher if it is materially misleading in a way that would negatively impact the consumer's creditworthiness. *Id.* at 15 (citing *Saunders v. Branch Banking and Tr. Co. of VA*, 526 F.3d 142, 148 (4th Cir. 2008)).

13

While I can appreciate Plaintiff's concern that it is most accurate to report that her HELOC debt is the product of fraud, I do not see how the finder of fact would conclude that the report contained a factual inaccuracy, per *Chiang*, 595 F.3d at 38, or that a more elaborate report that stated that the debt arose because Plaintiff fell victim to a fraud would have a positive impact on Plaintiff's credit score, in terms of the "materially misleading" inquiry undertaken in *Saunders*, 526 F.3d at 148. Rather, under the circumstances, Plaintiff is seeking to impose liability on Defendant based on "legal questions" over who is liable for the loss. *Id.* The FCTA does not supply the answer to that question. Moreover, as discussed above, the EFTA—the only statute at issue that might serve to reassign such a loss—does not support Plaintiff's claim for reimbursement. Given the absence of any factual inaccuracy in the report, Count II is dismissed.

### C. Count III

The Fair Credit Billing Act ("FCBA") was enacted, in principle part, to protect consumers against credit billing practices that are unfair and inaccurate. *Asociacion De Detallistas De Gasolina De Puerto Rico, Inc. v. Puerto Rico*, 138 F.4th 686, 690 (1st Cir. 2025). The FCBA amended the Truth in Lending Act, *Am. Exp. Co. v. Koerner*, 452 U.S. 233, 234 (1981), including by providing for the "correction of billing errors" at 15 U.S.C. § 1666.

If a consumer (the FCBA uses the term "obligor") provides a creditor with a timely notice of a billing error, the FCBA requires the creditor to acknowledge the notice (within 30 days) and to investigate the matter for the purpose of either making a correction or else informing the consumer why the creditor believes the billing is correct (within two billing

cycles or 90 days). *Id.* § 1666(a). What constitutes a "billing error" is defined to include "[a] reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement." *Id.* § 1666(b)(1). When a creditor fails to comply, it "forfeits any right to collect from the obligor the amount indicated by the obligor . . . and any finance charges thereon, except that the amount required to be forfeited . . . may not exceed $50." *Id.* § 1666(e). Noncompliance also exposes the creditor to liability for damages under 15 U.S.C. § 1640.

Plaintiff alleges that Defendant's billing of Plaintiff's account to include the HELOC debt is a billing error because the debt was not drawn or authorized by Plaintiff. Compl. ¶ 94. Defendant argues that Court III must be dismissed because there was no billing error concerning the HELOC extensions of credit since they were made to Plaintiff as obligor. Mot. at 7. Plaintiff responds that a billing error is alleged because the extension of credit was not authorized. Resp. at 6.

Although Plaintiff alleges a "billing error" in her Complaint, the allegations do not disclose any actual billing error because they do not demonstrate that the extensions of credit from the HELOC were not made to Plaintiff's own account in the amounts reflected on the statement. The FCBA's definition of "billing error" does not turn on whether or not the extension of credit was authorized, but rather on whether it was made to Plaintiff in the amount indicated. Furthermore, because it is alleged that Defendant responded to Plaintiff's notice in a communication that both acknowledged her notice and informed her why the billing was correct, all within 30 days, there is no basis for liability based on Defendant's alleged non-responsiveness.

15

## CONCLUSION

Although the Court is sympathetic to Plaintiff, for the reasons indicated the federal statutes cited by Plaintiff do not provide her with a right to make Defendant absorb the loss arising from the fraud she fell prey to, since Plaintiff affirmatively acted to her own detriment by withdrawing cash from one of Defendant's branch offices and depositing the cash into an ATM. Nor do Plaintiff's allegations otherwise raise a plausible claim for recovery under the Fair Credit Reporting Act or the Fair Credit Billing Act. However, Plaintiff has stated one plausible claim, in Count I, based on Defendant's alleged failure to meet the time requirements specified in the Electronic Fund Transfer Act's error resolution provision.

Accordingly, Plaintiff's Motion to Dismiss is GRANTED IN PART and DENIED IN PART (ECF No. 7). Count I is DISMISSED IN PART insofar as it is drawn to recover an amount that would reimburse Plaintiff for the loss she suffered due to fraud, but not in regard to a claim to recover a statutory award based on Defendant's alleged noncompliance with the ten-day provisional recredit requirement of the EFTA. Count II and Count III are DISMISSED. Count IV is DISMISSED pursuant to Rule 41 (*see* note 2).

SO ORDERED.

Dated this 27th day of January, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge